UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER JAMES BAILEY,

       Plaintiff,                               Case No. 10-15118

v.                                       HON. AVERN COHN

FAST MODEL TECHNOLOGIES, LLC,

       Defendant.

_____/

**MEMORANDUM AND ORDER**
**GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC.12)**

**DENYING IN PART AND GRANTING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC.24)**

**GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO AMEND**
**THE COMPLAINT AND TO EXTEND DISCOVERY (DOC. 27)**

### I. Introduction

      This is a breach of employment contract case. Plaintiff, Christopher James Bailey (Bailey), worked for the defendant, Fast Model Technologies, LLC (Fast Model) as a software sales representative. Fast Model terminated Bailey's employment for what it says was cause. Baily claims that Fast Model failed to pay him commissions he earned under the terms of his employment contract and did not compensate him for additional work developing Fast Model's football software.

      The complaint is in five (5) Counts: I) Violation of Michigan Sales Representative Commission Act (MSRCA), M.C.L. §600.2961; II) Violation of Michigan's Procuring Cause Doctrine for Post-Termination Commissions; III) Promissory Estoppel; IV) Breach of Contract; and V) Unjust Enrichment and Quantum Meruit. Bailey asks the Court to

award him unpaid commissions earned prior to and after his termination from Fast Model, penalties under M.C.L. §600.2961, and an ownership interest in Fast Model's football software.

Now before the Court are three (3) motions, Bailey's motion for partial summary judgment (Doc. 12) (pre-termination commissions), Fast Model's motion for summary judgment (Doc. 24) (pre and post-termination commissions and an ownership interest in the football software), and Bailey's motion to amend the complaint and to extend discovery (Doc. 27).

For the reasons that follow, Bailey's motion for partial summary judgment (Doc. 12) Count (1) and Count (IV) is **GRANTED**. Fast Model's motion for summary judgment (Doc. 24) is **GRANTED** as to Counts (II), (III), and (V) and **DENIED** as to Counts (I) and (IV). Finally, Bailey's motion to amend the complaint and to extend discovery (Doc. 27) is **GRANTED** as to proposed count (VI) Tortious Interference with Contract and **DENIED** as to proposed Count (VII) Intentional Infliction of Emotional Distress.

## II. Background

### A. Employment Contract

The facts, as gleaned from the parties' papers follow. Fast Model is a New Jersey company specializing in software for athletic teams and coaches. Fast Model hired Bailey in January of 2010 to sell coaching software to high school and college athletic teams. The parties entered into an employment contract in January of 2010, which provided for an annual base salary of $24,000, plus commissions of twenty-five percent (25%) of gross sales for new accounts, and seventeen and one-half percent (17.5%) of gross sales on renewals of existing clients. Bailey's duties required him to:

> lead, run and manage the Fast Model Football division as well as selling to division 1 baseball and softball teams. Developing new client relationships and expanding our market share by selling the products offered by Fast Model Technologies.

The contract also stated that Bailey was an "at-will" employee and could be terminated at any time for any reason, with or without notice. Further, Bailey's commissions were to be paid "at the end of each month once our account receivable department has received payment."

When Bailey joined Fast Model, it was in the process of developing football-coaching software. Bailey says he helped develop the software and performed market research. Bailey says that his advice and input were critical to the project. The football software was not ready to bring to market in time for the 2010 season. As a result, the parties agreed to modify Bailey's employment contract in April 2010. Instead of selling football software, Bailey was to sell basketball software to NCAA Division I college teams in the Eastern portion of the United States. During the negotiations for contract modification, Bailey agreed that his commission on renewal contracts would decrease from seventeen and one-half percent (17.5%) to seventeen percent (17%). The remaining contract terms stayed the same. Bailey sold basketball software from May to August 2010 to NCAA Division I teams.

## B. England

Sometime in the beginning of 2010, Bailey encouraged Fast Model to hire his former girlfriend, Heidi England (England). Fast Model hired England to work in accounts receivable; she did not report to Bailey. Soon thereafter, the relationship between Bailey and England soured. Fast Model says that Bailey engaged in a

campaign of sexual harassment toward England. Specifically, that Bailey threatened to use his influence in the company to have England fired unless she agreed to his demands for sexual favors. England says that Bailey harassed her with unwanted telephone calls, including calling her ninety-three (93) times in one day from his work phone, sending profane emails, and coming to her home uninvited.

### C. Termination

England brought the situation to the attention of her supervisor at Fast Model on August 17, 2010, who relayed her complaint  to Comerford. Comerford spoke to Bailey and instructed him not to have further contact with England. Fast Model retained a law firm to investigate England's allegations. Despite Fast Model's instructions to the contrary, Bailey attempted to contact England by phone under the guise of discussing a client issue. England reported the attempt to Fast Model management. Bailey subsequently e-mailed England. The email, according to Fast Model, contained veiled threats that scared England into reporting Bailey to the police.

Fast Model suspended Bailey on August 26, 2012 pending the completion its investigation. The attorney retained by Fast Model to investigate England's complaint concluded that Bailey's conduct amounted to quid pro quo sexual harassment and hostile work environment sexual harassment. Accordingly, Fast Model's attorney recommended Bailey's termination. Fast Model terminated Bailey effective September 10, 2010. Bailey says that he was not paid all of the commissions he earned.

### III. Bailey's Motion for Partial Summary Judgment

Bailey moves the Court to enter partial summary judgment in his favor on Counts (I) Violation of Michigan Sales Representative Commission Act (MSRCA) M.C.L. §600.2961 and (IV) Breach of Contract. Bailey calculates that his unpaid commission total $29,463.43. Bailey requests treble damages, $88,390.29, attorney's fees, and costs. As will be discussed, Fast Model argues that Bailey cannot recover based on the faithless servant doctrine and the absence of a contractual right to post-termination commissions.

### IV. Fast Model's Motion for Summary Judgment

Fast Model moves the Court to enter for summary judgment in its favor. Fast Model says that as to Counts (I) and (IV), Bailey forfeited compensation through misconduct. As to Count (II), Bailey is not entitled to recover under a procuring cause claim because he did not procure any accounts. Further, Fast Model argues that the procuring cause doctrine does not apply to terminations for cause. Finally, Fast Model says that Bailey cannot prevail on Counts (III) and (V) because he was compensated in accordance with the terms of his written contract.

### V. Legal Standard for Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion.  *Moore v. Philip Morris Co.*, 8 F.3d 335, 340 (6th Cir. 1993); *see also Anderson*, 477 U.S. at 249–50. "[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (internal mark omitted).

## VI. Discussion: Bailey's Motion for Partial Summary Judgment

### A.  Michigan Sales Representative Commission Act

#### 1. M.C.L. §600.2961

The inquiry considering what commissions, if any, Fast Model owes Bailey must begin with the MSRCA, M.C.L. §600.2961.[1] The MSRCA provides that its terms are mandatory and cannot be waived by contract. Section 600.2961(4) requires a principal to pay all commissions due to a sales representative at the time of termination within forty-five (45) days. Commissions that become due after the date of termination shall be

---

[1] Section 600.2961 applies to sales made out of state by a Michigan sales representative. *See Stonemen Group, Inc. v. Metalforming Technologies, Inc.*, 362 F.Supp.2d 896 (E.D. MI 2005).

6

paid within forty-five (45) days of the date the commission became due. The MSRCA states that the terms of the contract between the parties determine when a commission becomes due. The contract between Fast Model and Bailey states that a commission becomes due at the end of the month that Fast Model receives payment from the customer.

Fast Model admits that $1,415 in commissions became due to Bailey from August 27, 2010 to September 10, 2010. Fast Model also acknowledges that if Bailey "had not been suspended…he would have earned $10,024.50" during the period from August 27, 2010 through September 7, 2010.

### 2. The Three Groups

Bailey calculates that Fast Model owes him a total of $29,409.50 in unpaid commissions. The total, according to Bailey, can be broken down into three different categories. The first group represents sales invoiced and paid by the customer prior to September 10, 2010, which Bailey calculates at $12,409.50. The second group consists of sales invoiced before September 10, 2010 but paid by the customer after September 10, 2010, which total $11,226.93. Finally, the third group consists of sales originally invoiced before September 10, 2010 but later re-invoiced and paid after September 10, 2010. Bailey says the third group totals $5,827. Bailey also seeks penalties under M.C.L. §600.2961, which allows for the recovery of a sum twice the amount of unpaid commissions, the unpaid commissions, attorney's fees, and court costs.

### 3. Accrue v. Due

The MSRCA requires Fast Model to pay Bailey the commissions from all three groups. The unifying characteristic of the three is that the commissions accrued prior to

7

termination. Bailey's right to the commission accrued when he made a sale; the date the customer paid dictated when the commission became due.  Whether the commission became due before or after termination is irrelevant.

The Michigan Court of Appeals decided a similar case, which is instructive here. In *Walters v. Bloomfield Hills Furniture*, 228 Mich. App. 160 (Mich. Ct. App. 1998)[2], the plaintiff Walters, a furniture sales representative, voluntarily terminated his employment with the furniture store. The store subsequently refused to pay commissions on furniture sold by Walters but delivered after he terminated his employment. The store argued that its contract with Walters disclaimed payment of commissions on sales delivered after his employment ended.

The court of appeals held that the MSRCA rendered contradictory contractual terms void. The court explained "[t]he text of the statute indicates that the Legislature intended to ensure that sales representatives are paid the commissions to which they are entitled, especially where those commissions come due after the termination of the employment relationship. This conclusion is supported by the legislative analysis." Like Walters, Bailey's commissions became due upon a subsequent triggering event; for Walters the triggering event was the customer taking delivery. For Bailey, the date the customer paid the invoice determined when his commission became due. The MSRCA recognizes that commissions accrue before they become due. It requires payment of all commissions that accrued before the date of termination.

---

[2] Federal courts considering claims under the MSRCA have questioned the court's reasoning and the subsequent adherence by the court of appeals as to whether the parties may waive post-termination commissions through an employment contract. *See e.g. Eungard v. Open Solutions, Inc.*, 517 F.3d 891, 898 (6th Cir. 2008). Because Bailey's employment contract contained no such limitation, this concern does not apply.

## B. The Faithless Servant Doctrine

Nevertheless, Fast Model says that it is excused from paying commissions owed to Bailey based on the faithless servant doctrine. The faithless servant doctrine prohibits an agent from profiting from misfeasance or malfeasance. An agent who engages in misconduct will forfeit the compensation related to the service that was improperly performed. *See e.g. Harris v. Specialties Distributing Co.*, 305 Mich. 373, 379 (1943). Fast Model argues that because Bailey was involved in sexual harassment while at work, he is not entitled to his unpaid commissions.

The faithless servant doctrine does not apply to Bailey because his misconduct was not related to the underlying service for which he seeks compensation. The faithless servant doctrine applies in cases where an employee seeks compensation for an improperly performed service.[3] For example, in *Burnam v. Kelly*, 299 Mich. 452 (1941), the executor of an estate forfeited his right to compensation through misconduct and mismanagement of the estate's property. The executor, Kelley, sold timber on the estate's land without permission of the court or an appraisal. Further, Kelley failed to collect rents and pay taxes, destroyed documents, and filed false papers with the court. The estate's beneficiaries sued for damages. Kelley attempted to offset his liability to the estate by the amount of his management fee. The court held Kelley could not collect a fee for work on behalf of the estate because his work amounted to gross mismanagement of the estate.

Similarly, the court held an attorney who breaches his fiduciary duty to his client could not collect payment for the underlying services. *Rippey v. Wilson*, 280 Mich. 233,

---

[3] Additionally, the faithless servant doctrine usually involves a breach of fiduciary duty although the Court knows of no Michigan authority that specifically so holds.

245, 273 N.W. 552 (1937). The plaintiffs in *Rippey* were patent attorneys who represented an inventor competently for several years. A dispute arose over unpaid fees and the attorneys' representation thereafter was improper. The court allowed the attorneys to recover their fees for services performed faithfully but not for services that included misconduct. *Rippy* instructs misconduct is not a complete bar to compensation so long as the services are severable.

The doctrine remains unchanged in more recent decisions of the court of appeals. *See Tooling Mfg. & Technologies Ass'n v. Tyler*, 2010 WL 5383529 (Mich. Ct. App. December 28, 2010). For example, in *Tooling Mfg. & Technologies Ass'n*, Tyler was an insurance agent who worked for a trade association. Tyler was tasked with selling insurance policies to member companies. Tyler diverted commissions belonging to the association to a company he owned. After his deceit became known, the association sued to recover its losses. Tyler argued that the association owed him bonus payments on the same sales. The *Tooling* court refused to award Tyler bonuses derived from business he was simultaneously misappropriating for personal gain. Tyler could not collect payment for work that included misconduct.

Nevertheless, Fast Model argues that the faithless servant doctrine is a complete bar to compensation. Fast Models cites to *Toy ex rel. Ketcham v. Lapeer Farmers Mut. Fire Ins. Ass'n*, 297 Mich. 188, 193 (1941), to support the proposition that an employee who engages in misconduct forfeits all of his compensation. *Toy* involved an insurance company that was in receivership after being badly mismanaged. The treasurer of the company sued to collect back salary. The court denied recovery because the treasurer's performance of his duties was grossly negligent. In *Toy*, denial of the treasurer's entire

10

salary was proportional to his complete failure to perform his duties. *Toy* is distinguishable because the treasurer in *Toy* sought compensation for services improperly performed. Such is not the case with Bailey.

Next, in support of its argument, Fast Model points to the language of *Harris v. Specialties Distributing Co.*, 305 Mich. 373, 379 (1943).

> An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such conduct constitutes a [willful] and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned. *Id.* at *8 (citing 2 Restatement Agency, 2d, § 469, p. 399).

However, the phrase "he is not entitled to compensation even for properly performed services" should not be plucked out of context and severed from its modifying clause to fashion a new rule of law heretofore unknown to Michigan courts.

In all of the cases discussed above, the disputed compensation relates to the improperly performed service. Bailey did not commit misconduct with respect to his duties as a salesperson; therefore, he is not profiting from his misdeeds. The faithless servant doctrine does not apply to Bailey.

### C. Actively Servicing Accounts

In the alternative, Fast Model argues that for Bailey to earn a commission he had to be actively servicing an account. This would preclude recovery on commissions that accrued during Bailey's suspension. This period of suspension covers the vast majority of the commissions in dispute. Fast Model offers the affidavit of one of its employees who avers to the fact that Fast Model did not intend that a suspended employee to collect commissions. First, to the extent that this policy is inconsistent with the MSRCA it is void. Second, there was no policy in place regarding payment of commissions

11

during a suspension when Bailey was suspended. There is nothing in the record to show that any policy on compensation during suspension was communicated to Fast Model employees. As such, Fast Model cannot create a post-hoc condition of employment to avoid paying accrued commissions. Fast Model drafted the contract; accordingly, ambiguities are resolved against Fast Model.

Because Fast Model failed to timely pay commissions of $29,463.43, the MSRCA entitles Bailey to treble damages totaling $88,390.29, plus reasonable attorney's fees, and court costs.

### VII. Discussion: Fast Model's Motion for Summary Judgment

### A. Procuring Cause Doctrine: Post-Termination Sales

Next, Bailey says the procuring cause doctrine entitles him to post-commission sales; it does not. The procuring cause doctrine is an equitable remedy designed to ensure salespeople are compensated for their work. The purpose of the principle is to ensure fair dealing and to "prevent a principal from unfairly taking the benefit of the agent's or broker's services without compensation." *Steinke & Associates, Inc. v. Loudon Steel*, Inc., No. 263362, 2006 WL 664346 (Mich. Ct. App. March 16, 2006) (citing *Reade v. Haak*, 147 Mich. 42 (1907)). The doctrine was first applied in Michigan with respect to the sale of real estate. The doctrine prevented a seller from dismissing his agent to avoid paying commission after the agent found a buyer but before the sale was complete.[4] *See e.g. Heaton v. Edwards*, 90 Mich. 500 (1892); *Ranson v. Weston*, 110 Mich. 240 (1896).

---

[4] For a discussion of the historical development of the procuring cause doctrine in Michigan, *see* Randall Gillary, *The History of the Procuring Clause Doctrine in Michigan*, 74 MICH. B.J. 1264 (December 1995).

The Michigan Supreme Court decided the seminal case on the procuring cause doctrine, *Reed v. Kurdziel*, in 1958. 352 Mich. 287 (1958). In *Reed*, the parties had an oral contract for commission on sales to customers secured by Reed. Reed was the exclusive sales agent for the company's products. Kurdziel paid Reed the agreed upon rate for the initial sales but refused to remit a commission on renewals from the same customers. Reed sued to recover commissions on the renewals. The trial court made findings of fact that the parties intended that Reed would receive commission on the "account" as opposed to the first sale. Moreover, the court found the contract was intended to be of an unlimited duration. Affirming an award to Reed, the court noted that Reed did not have to personally close every sale, it was sufficient that he was the procuring cause. *Reed* and its progeny make clear that an express agreement between the parties determines the salesperson's right to post-termination commissions. *See e.g. Titchenal v. Jackson & Church Co.*, 375 Mich. 281 (1965).[5] The present case contains no such agreement.

This Court considered an argument similar to Bailey's several years ago. The Court observed:

> [t]he question of whether an agent is entitled to continuing commissions on accounts which he has introduced to the principal, but which the principal subsequently appropriates for himself, has never been directly addressed by Michigan appellate courts. However, a brief analysis of the relevant authority suggests that no such right exists.
>
> Despite plaintiff's vigorous assertions that he is entitled to continuing commissions for all sales to customers he originally procured, the law is clear that, absent any agreement to the contrary, a salesman is entitled

---

[5] Subsequent decisions also make clear that whether or not an agent is the procuring cause is a question of fact for the jury.

only to commissions for sales he actually makes. Plaintiff has not cited a single case to the contrary. *Roberts Associates, Inc. v. Blazer Int'l Corp.*, 741 F. Supp 650, 652 (ED MI 1990)(Cohn, J).

The facts in this case do not lend support to the notion that Fast Model and Bailey intended to establish a right to indefinite and perpetual commissions.[6] In contrast, the parties defined the life of their relationship as terminable at-will by either party. The procuring cause doctrine cannot be used to fashion a better deal than the one for which Bailey bargained. *Aerotronics, Inc. v. Pneumo Abex Corp.*, 62 F.3d 1053, 1065 (8th Cir. 1995) (applying Michigan law and explaining the procuring cause doctrine "cannot be used to supplant or contradict terms of contract entered into between parties.") The ability of his employer to discharge him at any time for any reason is fundamentally incompatible with the argument Bailey advances.

Fast Model argues that the procuring cause doctrine does not apply in terminations for cause. This argument finds support in a recent Michigan Court of Appeals decision. *KBD & Associates, Inc. v. Great Lakes Foam Technologies, Inc.*, No. 303044, 2012 WL 800650 (Mich. Ct. App. March 15, 2012). The sales representative in *KBD* was fired after a large client of his principal refused to work with him. The court of appeals stated that the procuring cause doctrine did not apply because the salesperson was not fired to avoid paying commissions.

Finally, Bailey's claim must be viewed against the backdrop of the purpose of the procuring cause doctrine. The procuring cause doctrine is an equitable remedy designed to protect a salesperson from unscrupulous principals who would use his

---

[6] Fast Models does not cite a case, nor is the Court aware of a case, where a salesperson succeeded under the procuring cause doctrine to secure "commissions for life" absent the express agreement of the parties.

services but not compensate him. Fast Model terminated Bailey for sexual harassment. The procuring cause doctrine does not apply.

### B. Contractual Right to Post-Termination Commissions

Next, Bailey says that his contract entitles him to renewal commissions on the accounts he serviced. The basis of this assertion is the language of the contract that says Bailey will receive a seventeen percent (17%) commission on "all existing renewal." Bailey interprets "existing" to mean, "as long as the account exists." Bailey's interpretation is unconvincing. Bailey is an "at-will" employee and as such has no expectation of commissions beyond the life of his employment with Fast Model. It is a principle of contract law that the contract must be read as a whole to give effect to all of its terms. 11 WILLISTON ON CONTRACTS § 32:9 (4th ed.). A perpetual right to commissions is incompatible with an at-will employment relationship.

### C. Promissory Estoppel

Next, Bailey says the Court should award him a twenty percent (20%) ownership interest in Fast Model's football software under the doctrine of promissory estoppel. "[W]ho, by his language or conduct, leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted." *Dickerson v. Colgrove*, 100 U.S. 578 (1879). As the preceeding quote explains, equity can render a gratuitous promise enforceable when detrimentally relied upon by the promissee. Thus, an action in promissory estoppel first requires a promise. There is nothing in the record to indicate that Fast Model made any promise to Bailey concerning an ownership interest in its football software or

compensation beyond his base salary and future sales commissions. Accordingly, Bailey cannot maintain a promissory estoppel claim.

### D. Quantum Meruit

In the alternative, Bailey says he should be awarded an ownership interest in Fast Model's football software based on a theory of unjust enrichment or quantum meruit.

> The elements of a claim for unjust enrichment are: (1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant. *Dumas v. Auto Club Ins. Ass'n*, 437 Mich. 521, 546 (1991). In such instances, the law operates to imply a contract in order to prevent unjust enrichment. *Martin v. East Lansing School Dist.*, 193 Mich. App. 166, 177 (1992). However, a contract will be implied only if there is no express contract covering the same subject matter. *Id.*; *Campbell v. City of Troy*, 42 Mich.App. 534, 537 (1972) (citations altered).

*Barber v. SMH (US), Inc.*, 202 Mich. App. 366 (Mich. Ct. App. 1993). Bailey says that his work in developing Fast Model football coaching software was beyond the scope of his contractual duties. Further, Bailey says his contributions to the software were significant and Fast Model stands to benefit from his work without compensating him. Bailey's argument fails for several reasons; most importantly, it fails because there is an express contract covering the same subject matter.

Bailey's employment contract requires him to "lead, run and manage the Fast Model Football division as well as selling…" First, the language "as well as" belies Bailey's assertion that his role was limited exclusively to sales. The verbs "lead" "run" and "manage" contemplate services beyond sales. Second, when Bailey was hired he knew the football software was not yet operational and that Fast Model hoped it was be ready by spring. Bailey knew he would not be able to sell football software for several

16

months after his employment started and his base salary would be his only compensation. Moreover, Bailey's contract gives Fast Model the right to alter his responsibilities at its sole discretion. Bailey received his bargained for compensation in the form of his base salary.

The Michigan Court of Appeals rejected a similar argument made by a sales representative. In *Barber supra*, a manufacturer's representative who sold watches argued that his untimely termination unjustly enriched his former employer. Barber asserted that his employer used his knowledge and expertise to develop its sales accounts and then terminated him without compensation for the value of his service. The court of appeals rejected his argument, finding that an express contract governing the salesperson's compensation precluded a claim for unjust enrichment.

Bailey's claim is barred because the law will not imply a contract where there is an express contract covering the same subject matter. *Belle Isle Grill Corp. v. City of Detroit*, 256 Mich. App. 463 (Mich. Ct. App. 2003). There cannot be an express and implied contract covering the same subject matter at the same time. *Superior Ambulance Service v. Lincoln Park*, 19 Mich. App. 655 (Mich. Ct. App. 1969).

### VIII. Bailey's Motion to Amend

Finally, Bailey moves to amend his complaint to add counts of tortious interference with contract and intentional infliction of emotional distress (IIED) and to add Comerford as a defendant.[7] Bailey claims that Comerford convinced his

---

[7] Fast Model argues that the Court lacks personal jurisdiction over Comerford. However, Michigan's long arm statute, M.C.L. §600.705 provides personal jurisdiction over a tortfeasor when the consequence of the tort occurs in Michigan. Assuming Comerford has no other contacts with Michigan if Bailey pled an actionable tort claim, then the

subsequent employer, Scoutware, LLC (Scoutware), to fire him in retaliation for filing the present suit. The events that form the basis for Bailey's motion to amend occurred during the pendency of this case. Additionally, Bailey conducted discovery on his termination through discovery in this case. The facts as gleaned from Bailey's proposed first amended complaint (Doc. 27 ex. 1) and exhibits (Doc. 27 ex. 2-4) follow.

### A. Termination from Scoutware

After Bailey's termination from Fast Model, he secured employment with a company called Scoutware. During discovery, Fast Model requested any subsequent employment contracts entered into by Bailey. With some hesitancy, Bailey disclosed his agreement with Scoutware on October 17, 2011. Scoutware terminated Bailey on November 4, 2011. Before Bailey's termination Scoutware's chief executive officer asked him why he did not disclose his lawsuit against Fast Model.

Bailey's counsel deposed Comerford on December 13, 2011. During questioning, Comerford acknowledged he spoke with Kate Cronin, an employee of Scoutware. Comerford says that Cronin is a business acquaintance with whom he maintains contact and occasionally sees socially.

Bailey subpoenaed Cronin's telephone records. The records show six (6) telephone calls between Comerford and Cronin on October 19, 2011, two days after Bailey disclosed his employment contract with Scoutware. The phone records show Comerford and Cronin had not spoken previously for seven (7) months. After speaking with Comerford, Cronin telephoned the executive vice president of Scoutware Andy Clark, then telephoned Jeff Murphy the chief executive officer of Scoutware. On October

---

Court has personal jurisdiction over Comerford. If Bailey's claim does not survive then the issue is moot.

20 and 22, 2011, Cronin exchanged text messages with both Comerford and Murphy. The day preceding Bailey's termination from Scoutware, November 4, 2011, Cronin had a forty-five (45) minute telephone conversation with Murphy and the two exchanged eight (8) text messages.

Bailey's counsel expressed his concern on December 3, 2011 to Fast Model that Bailey was terminated in such close proximity to the disclosure of his Scoutware employment contract. Two days later, December 5, 2011 Comerford called Cronin and spoke for twenty (20) minutes and the two exchanged four (4) text messages. During his deposition, Comerford admitted to speaking with Cronin but denied discussing Bailey beyond acknowledging that he previously worked for Fast Model. Two days after his deposition, Comerford and Cronin exchanged ten (10) text messages and one phone call.

Bailey says that Comerford's contacts with Cronin were designed to secure his termination. Bailey says that the timing of the communications between Comerford and Cronin raise the inference of intentional interference with Bailey's contract with Scoutware.

## B. Legal Standard

Under Fed. R. Civ. P. 15(a), a party may amend its pleadings after 20 days "only by leave of court or by written consent of the adverse party" and leave to amend "shall be freely given when justice so requires." The decision whether or not to permit the amendment is committed to the discretion of the trial court. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330-32 (1971); *Estes v. Kentucky Util. Co.*, 636 F.2d 1131, 1133 (6th Cir. 1980). This discretion, however, is "limited by Fed.

19

R. Civ. P. 15(a)'s liberal policy of permitting amendments to ensure the determination of claims on their merits." *Marks v. Shell Oil Co.*, 830 F.2d 68, 69 (6th Cir. 1987) (citation omitted).

### C. Tortious Interference with Contract

#### 1. Prima Facie Case

A prima facie case of tortious interference with contract or expectancy requires proof of the following: a business relationship, intentional interference, and damages. *CH Holding Co. v. Miller*, No. 293686, 2011 WL 5008573 (Mich. Ct. App. Oct. 20, 2011) (internal citation omitted). Improper interference can be shown either by proving "(1) the intentional doing of an act wrongful per se, or (2) the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiffs' contractual rights or business relationship." *Id.*

Bailey had a contractual employment relationship with Scoutware of which Fast Model and Comerford knew. The timing of Bailey's termination following disclosure of his Scoutware contract coupled with the timing of the telephone exchanges between Comerford and Cronin raises a plausible claim that Comerford had something to do with Bailey's termination.

### D. Intentional Infliction of Emotional Distress

Bailey's final allegation is that James Goodwin, who is the chief operating officer of Fast Model, sent a letter to the state unemployment agency saying that Bailey was not entitled to unemployment benefits due to his misconduct. Bailey says that the sole purpose of the letter was to retaliate against him for filing the present suit by interfering in his ability to earn a living. The Sixth Circuit explained the tort of IIED as: "[o]ne who

by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." *Polk v. Yellow Freight Sys., Inc.*, 801 F.2d 190, 195 (6th Cir.1986). Polk goes on to quote the Second Restatement of Torts: "nor is the defendant liable 'where he has done no more than to insist upon his legal rights in a permissible way, even though he was well aware that such insistence is certain to cause emotional distress.'" RESTATEMENT (2D) OF TORTS § 46, comment g (1965).

M.C.L. §421.29(b) disqualifies an employee terminated for misconduct from receiving unemployment benefits. Fast Model did nothing more than exercise its legal right to challenge an award of unemployment benefits. Bailey has not stated a plausible claim for IIED. As such, amendment would be futile.

**SO ORDERED.**

Dated:  May 2, 2012                        s/Avern Cohn_____
                                           AVERN COHN
                                           UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, Wednesday, May 2, 2012, by electronic and/or ordinary mail.

                                           s/Julie Owens_____
                                           Case Manager, (313) 234-5160

21